# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs August 1, 2024

### IN RE EZMAIE F., ET AL.[1]

**Appeal from the Juvenile Court for Houston County**
**No. 2022-JV-92      Markley Preston Runyon, Judge**

_____

### No. M2023-01731-COA-R3-PT

_____

A father and mother appeal from an order terminating their parental rights to their two minor children. The trial court held that the evidence presented supported termination of each parent's rights based on the statutory grounds of abandonment by failure to provide a suitable home, persistence of conditions which led to removal, severe child abuse, and failure to manifest an ability and willingness to assume custody or financial responsibility. The court also found that termination was in the children's best interests. Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and JEFFREY USMAN, J., joined.

Timothy Scott Daniel, Waverly, Tennessee, for the appellant, Timothy F.

Lester Williams Riggins, Dover, Tennessee, for the appellant, Sadie M.

Jonathan Skrmetti, Attorney General and Reporter, and Mara Lynne Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Mickie (Mary) Furlong Smith, Dickson, Tennessee, guardian *ad litem*.

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

**OPINION**

## I. BACKGROUND

This appeal concerns Ezmaie F. and Rosalee F. ("the children") who were born to Sadie M. ("Mother") and Timothy F. ("Father") in 2017 and 2018, respectively. On March 21, 2021, the City of Erin Police Department responded to a report that Mother and Father's adult daughter was selling drugs from the home in which the minor children lived. The police questioned Mother, after which she produced a bag of marijuana. Upon searching the home, police found illegal firearms, heroin, and various prescription drugs, all easily accessible to the children. Right away, the police noticed that the home was filthy. They observed a garbage-filled bathtub and that the home reeked of urine, did not have running water, had moldy food in the kitchen, and feces all over. Mother and Father were arrested the same day. Each tested positive for Oxycodone and THC. Neither could articulate a plan of care for the children, so the Tennessee Department of Children's Services ("DCS") removed them from the home. The grand jury returned an indictment charging Mother and Father with felony neglect of the children, unlawful possession of firearms, possession of illegal substances with intent to distribute, and possession of drug paraphernalia.

On March 22, 2021, DCS petitioned the court to adjudicate the children dependent and neglected and for temporary legal custody. DCS alleged environmental concerns and that the children were exposed to drugs. The next day, the Houston County Juvenile Court ("trial court") entered a protective custody order by which DCS received temporary legal custody of the children. DCS's drug exposure suspicions were well-founded, for each child tested positive for methamphetamine, cocaine, and THC following hair follicle drug screens on March 25, 2021. The children have lived in a foster home since their removal from the parents' home.

The children arrived to their Foster Mother's home pale, dressed in ill-fitting clothing, covered in dirt, showing obvious dental decay, and visibly louse-infested. Neither child was fully potty trained and neither played like a child of her age should. Foster Mother took Ezmaie to the doctor soon after this. When Ezmaie's ears were flushed, dead lice and debris fell out. Both children presented with low iron which was corrected after Foster Mother administered iron supplements for several months. Five of Ezmaie's decayed teeth were extracted.

Meanwhile, Mother was released from incarceration on March 30, 2021, and Father was released on May 8, 2021. On February 17, 2022, Father pled nolo contendere to the charges of child neglect and endangerment, possession of a prohibited weapon, simple possession of marijuana, and simple possession of Schedule II and Schedule III drugs. On August 23, 2021, Mother pled guilty to child neglect or endangerment, possession of

marijuana with intent to distribute, possession of a Schedule III drug for sale, and possession of a Schedule II drug for sale.

Drug screen reports in the record reveal that Mother tested positive for cocaine on April 15, 2021, and for THC on August 26, 2021. Mother's subsequent drug screens were clean. On August 26, 2021, Father tested positive for methamphetamine and THC. On May 27, 2021, and on November 10, 2022, Father tested positive for methamphetamine. Approximately a week before trial, Father tested positive for THC.

Following a September 28, 2021, hearing, the trial court adjudicated the children dependent and neglected. Father and Mother stipulated to this finding based upon the facts alleged in DCS's dependency and neglect petition. The court reserved ruling on whether the children were victims of severe child abuse.

On October 6, 2022, DCS petitioned the trial court to terminate each parent's rights to each child based upon the following grounds: (1) abandonment by failure to provide a suitable home; (2) persistence of conditions which led to removal; (3) severe child abuse; and (4) failure to manifest an ability and willingness to assume custody or financial responsibility. DCS further alleged that termination would serve the children's best interests. Each parent answered the petition.

The case proceeded to trial on November 20, 2023, at which the following witnesses testified: Officer Josh MacDonald of the City of Erin Police Department; DCS family service worker Hailey Wilson, who was assigned the case during its first month; DCS case manager Amelia Duckett, to whom the case had been assigned since April 2021; Foster Mother; Mother; and Father.[2] By then, Ezmaie was six years old and participating in monthly mental health services. Rosalee was five years old. Along with the other kids in the home, the children had adapted to the routine in the home of Foster Mother and her husband, which included getting ready together, school, after-school play, homework, and bath time. Ms. Duckett noted that the children referred to the other kids in the foster home as their brother and sisters. The entire foster family enjoyed vacations, bicycle rides, baseball, and fishing together. Foster Mother professed her and her husband's desire to adopt Ezmaie and Rosalee.

On November 29, 2023, the trial court entered its initial order on DCS's petition. Each parent appealed. Upon the parties' motion, and by order entered April 1, 2024, we remanded this action to the trial court for an order setting forth specific findings of fact and conclusions of law. On April 26, 2024, the trial court entered its final order in which it found that the evidence presented established the statutory termination grounds alleged by DCS and that termination of each parent's rights was in each child's best interest. The trial court recalled that after "observing both of the parents in court at the trial, each parent

---

[2] We will discuss the evidence adduced at trial in detail below, as relevant to the issues on appeal.

- 3 -

seemed very non-caring and unable to appreciate the seriousness of the matter given all circumstances." The April 26 order is now before this Court for review.

## II. ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.      Whether there was clear and convincing evidence of the alleged grounds to terminate Mother's and Father's parental rights.

B.      Whether the trial court erred in finding that it was in the children's best interests to terminate Mother's and Father's parental rights.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(l)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds
> for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best
> interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.

2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2023, the Tennessee Supreme Court provided the following guidance to this court in reviewing cases involving the termination of parental rights:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary.

> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness.

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023) (internal citations omitted).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App.

2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995)); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).

## IV.    DISCUSSION[3]

### A.

The trial court found that clear and convincing evidence established four grounds for termination of Mother's and Father's parental rights: abandonment by failure to provide a suitable home, persistence of conditions, severe child abuse, and failure to manifest an ability and willingness to assume custody or financial responsibility.  We will consider each ground as required by our Supreme Court.  *See In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016) ("[T]he Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

*Abandonment by Failure to Provide a Suitable Home*

A parent may be found to have abandoned his or her child by failing to establish a suitable home. Tenn. Code Ann. § 36-1-113(g)(1).  This ground for the termination of parental rights is established when:

(a) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it

---

[3] We will reference the statutes which were in effect when DCS filed the petition for termination of parental rights on October 6, 2022.

appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). This ground for termination requires DCS to make reasonable efforts to assist a parent in obtaining a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.32 (Tenn. 2015). Although the statute requires DCS to make reasonable efforts toward the establishment of a suitable home for "a period of four (4) months following the physical removal" of the children, "the statute *does not* limit the court's inquiry to a period of four months *immediately* following the removal." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (emphasis in original). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). It requires a "safe and stable environment in which a child can live . . . and 'the presence of a care giver who can supply the care and attention a child needs.'" *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017) (quoting *In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *9 (Tenn. Ct. App. Mar. 23, 2015)) (citation omitted).

Here, the children were ordered into DCS's custody on March 23, 2021. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a). The trial court found it "was reasonable [for DCS] to make no effort to maintain the children in the home due to the circumstances of the family and the children" prior to removing them from the parents' home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(b).

As to DCS's reasonable efforts to assist the parents to establish a suitable home, case manager Amelia Duckett recounted that, during the four months following removal, she drove to Waverly to submit a housing application on the parents' behalf. Also, she twice shared the link to Habitat for Humanity with the parents, but the parents did not pursue housing assistance through that organization. DCS purchased two mattresses for the children. Ms. Duckett recalled, "I was not able to give them to the family because the locations they were living [were] never suitable for the children to be there." Throughout the custodial episode, DCS visited the parents' homes and clearly communicated any problems that needed to be resolved before the children could live in those homes.

Mother and Father resided in four homes from the time the children were removed until the date of trial. Officer MacDonald described the first house, where the children

lived at the time of removal, as "horrific," "filthy," and so "nasty" that the floor was hardly visible. Likewise, Ms. Duckett observed trash throughout, including in the bathtub, fly and cockroach infestations, larva in a pot of leftover food, and so much clutter that there was a narrow walking path created by piled-up items. For these reasons, most of Ms. Duckett's visits with the parents occurred right outside the home. Mother recalled moving into this house in November 2020. A week after moving in, the parents learned that this home lacked running water because it was to be condemned. They resided there until August 2021.

The next two homes the parents resided in were a rental trailer and a neighbor's home. In short, each parent admitted at trial that these homes were unsuitable for the children due to all manner of serious health and safety hazards.

By the time of trial, Mother, Father, and their adult daughter resided in a previously-abandoned camper that they had been renting since March 2023. Mother was employed as a housekeeper. Ms. Duckett visited in July 2023 and observed two indoor cats, two containers of used oil on the floor, part of the ceiling missing, exposed screws, objects piled on the bunk bed reserved for the children, and trash and cigarette butts on the floor. Ms. Duckett testified that she discussed the home's problems with the parents, and that they agreed to perform necessary improvements. Thereafter, Ms. Duckett visited the home monthly. However, she did not observe improvement between July and October of 2023, the month before trial. During the October 2023 visit, problems that could impact the children's health and safety remained, including prescription bottles left out in the open, trash on the floor, cigarette butts on the floor, and the stench of cat feces, cat litter, and cigarettes. The parents again acknowledged these problems. Finally, Ms. Duckett revisited the parents' home the week before trial. She observed a freezer outside for food storage, trash on the floor, the same stenches, pill bottles within a child's reach, and flies and cockroaches indoors. At trial, the parents testified that they were trying and their home was suitable for the young children.

At trial, Ms. Duckett identified photographs depicting the condition of the home during each of the above-described visits. Photographs that Mother took the morning before trial were also entered into evidence to show progress. She testified that she began exterminating the cockroaches since Ms. Duckett's prior visit. Mother claimed that she cleaned the home daily, except when she was feeling under the weather, and that Father merely "cleans like a man." Yet, anytime Ms. Duckett would visit, the parents claimed "they hadn't quite cleaned yet; they were getting around to it." The parents blamed the cats for the condition of their home, as though the cats possessed the dexterity to clean after themselves or after the three adults residing with them.

The evidence in the record leaves no doubt that each parent knew for years that securing and maintaining a suitable home was the primary challenge to overcome before they could regain custody of their young children. In this case, DCS's efforts to assist

Mother and Father exceeded their own efforts to establish a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). Although we acknowledge each parent's limited resources, they failed to improve their current living situation by, at the very least, keeping the home sanitary and free of clutter. Mother acknowledged that she has the skills to do so, given her job as a housekeeper. With all of the above considerations in mind, we conclude that DCS sufficiently proved each factor of the ground of abandonment by failure to provide a suitable home. Therefore, we affirm the trial court's holding that this ground for termination alleged against each parent was proven by clear and convincing evidence.

*Persistence of Conditions*

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. "The purpose behind the persistence of conditions ground for terminating parental rights is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (internal quotation omitted). When analyzing this ground for termination, we focus on the results of the parent's efforts at improvement rather than the mere fact that he or she [ ] made them. *In re Audrey S.*, 182 S.W.3d at 874.

Here, the children were removed from the parents' home by the requisite court order. Tenn. Code Ann. § 36-1-113(g)(3)(A). The conditions which led to their removal were child safety concerns due to environmental neglect and drug exposure. Under Mother and Father's care, the children lived in an unsanitary home, were pale, exposed to methamphetamine, cocaine, and THC, dressed in ill-fitting clothing, covered in dirt, developmentally behind, showing obvious dental decay, and visibly louse-infested. At trial, Mother stated that she attempted to treat the children's head lice for an entire year and that she "never noticed" the dead bugs in their ears. Foster Mother testified that in the ten years of fostering 38 children, she had never encountered a child in such a condition. The unrebutted testimony established that Foster Mother promptly helped the children remedy these conditions and that she ensured the children attended all medical appointments and schooling.

Foster Mother further recalled that, during the year before trial, she advised Mother that Rosalee had shingles and shared the doctor's treatment instructions with Mother. Mother did the opposite of what the doctor ordered which calls into question whether she has improved her ability to care for the children's health. Father failed a drug screen the week before trial, and Mother testified that she and Father planned to continue living together. Based on the foregoing evidence, as well as the evidence concerning the state of the parents' home at trial, we must agree with the trial court's observation that, despite DCS's diligent efforts in the years following removal, the case was "not much further along at the time of trial than it was at its inception."

Following our review, we conclude that there is little likelihood that the conditions which led to removal will be remedied at an early date so that the children can be safely returned to the parents in the near future and that the continuation of the parents' relationship with the children greatly diminishes their chances of early integration into a safe, stable, and permanent home. Therefore, we affirm the trial court's holding that this ground for termination alleged against each parent was proven by clear and convincing evidence.

*Severe Child Abuse*

The trial court terminated Mother's and Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(4), which provides:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child[.]

As relevant, Section 37-1-102(b)(27) defines "severe child abuse" as:

(E) Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]

Tenn. Code Ann. § 37-1-102(b)(27).

Very soon after removal from the parents' home, Ezmaie and Rosalee each tested positive for methamphetamine, cocaine, and THC following hair follicle drug screens on March 25, 2021. They were toddlers. As the trial court noted, the parents did not object to this evidence at any point. Neither parent disputed the children's drug screen results when confronted in their testimony. A few weeks after the children tested positive for illegal substances, including cocaine, Mother tested positive for cocaine. Five months later, Father tested positive for methamphetamine. On appeal, each parent argues that "the minor children came into custody in March of 2021 and there was no proof presented of an adjudication finding Severe Abuse." Their arguments fail because the statute explicitly provides that severe child abuse can be "found by the court hearing the petition to terminate parental rights," as the trial court found in this case. Tenn. Code Ann. § 36-1-113(g)(4).

"This Court has repeatedly held that exposure of a child to drugs constitutes severe child abuse." *In re A.L.H.*, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at *5 (Tenn. Ct. App. Aug. 31, 2017) (case involving parents exposing children to methamphetamine). We find that the facts in this record, by a preponderance of the evidence, support a finding that each parent was, at minimum, grossly negligent in allowing each child to ingest an illegal substance. The aggregate of these facts amounts to clear and convincing evidence of the elements necessary to terminate Mother's and Father's rights on the ground of severe child abuse.

*Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two

elements by clear and convincing evidence.  Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).  First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child.  *In re Neveah M.*, 614 S.W.3d at 674.  Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.  *Id.*

As to the first element, our Supreme Court has instructed as follows:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child.  If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child.  These circumstances are not amenable to precise definition because of the variability of human conduct.  However, the use of the modifier "substantial" indicates two things.  First, it connotes a real hazard or danger that is not minor, trivial, or insignificant.  Second, it indicates that the harm must be more than a theoretical possibility.  While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)).

Mother and Father did not evidence an ability to assume custody of the children.  The unsuitable condition of the parents' home was the primary barrier to reunification.  As detailed above, the home still had problems the week before trial.  The parents blamed their cats and DCS's timing for the conditions which made the home unsuitable for children in the first instance and by the time of trial.  When asked about the indoor cockroaches which were still present by the time of trial, Father responded, "Okay.  I mean, anybody around here can have roaches."  The trial court "took his response as non-caring."  Father admitted to failing a drug screen the week before trial.  The evidence adduced at trial showed that

- 12 -

the parents, for the most part, consistently visited with the children. However, Ms. Duckett reported that "[t]he parents wouldn't really get up to engage with the children. They would encourage the children to come to them, ask the children to bring them things" or that they would give the children a phone to watch videos. Ms. Duckett recalled that, during the visits, the parents' adult daughter "would do most of the caregiving, actually interacting with the children, preparing their food, [and] cleaning up their messes." When Rosalee had shingles, Mother ignored the doctor's treatment advice, which calls into question whether she has improved her ability to care for the children's health.

From these facts, we agree with the trial court that Mother and Father displayed an overall lack of an ability and willingness to assume legal and physical custody of the Children. The record further supports a finding that placing the children with them would pose a risk of substantial physical or psychological harm to their welfare, especially given the unresolved health and safety concerns in the parents' home. With all of these considerations in mind, we affirm the court's judgment terminating Mother's and Father's parental rights on this ground.

### B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, the trial court was required to consider whether termination of Mother's and Father's parental rights was in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of

circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In considering all of the statutory factors from the children's perspectives, the trial court highlighted various factors in favor of termination including:

> [T]hese children have had stability in the foster placement where they have been. The parents have not made any of the necessary adjustments so as to make a safe and feasible transition home. The children if returned would simply go back to the same living environment that they were removed from. The parents' testimony demonstrates that the cockroaches and cats have the most authority in that home.
>
> The children went to live with a foster family on March 21, 2021, and have been with the same family ever since. . . . . The children have bonded with the foster family and to remove them would be a detriment.
>
> Neither parent in this case has demonstrated continuity and stability and there was no proof that either one could adequately meet the basic needs of the children. This court saw no emotional attachment that either parent had for the children. Generally, in these types of matters there is sincere emotion, often during testimony, regarding the love and affection that a parent(s) ha[s] for the child(ren). In this case, **the court observed none**.
>
> With the lack of participation and forward movement on the part of the parents, this court does not see the healthy relationship between parent and child or would have any expectation that there ever would be one.
>
> The parents presented no proof that either parent has even hit the "tip of the iceberg" in trying to provide a safe environment for the children to be in the home of the parent(s). In addition, a failed drug test one week before the hearing clearly shows the court that there is no change in the pattern of

conduct.

> There was no evidence before the court that the parents have ever known how to provide a stable loving home for these children. The children were removed at a very young age.

(Emphasis in original). Tenn. Code Ann. §§ 36-1-113(i)(1)(A), (B), (C), (D), (H), (J), (O), (P), and (R).

The trial court considered all of the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination by clear and convincing evidence. We agree. The record demonstrates that each child's health has markedly improved under the foster family's care. Over the two years and eight months between removal and trial, the children enjoyed a safe, stable, sanitary, drug-free home, the positive effects of age-appropriate routines and family activities, and significant bonds with the entire foster family. Accordingly, we conclude that clear and convincing evidence in the record supports the determination that it was in the children's best interests for Mother's and Father's parental rights to be terminated.

## V. CONCLUSION

The trial court's judgment is affirmed. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed to the appellants, Timothy F. and Sadie M.

_____
JOHN W. McCLARTY, JUDGE